(Decided 18th June, 1891.)

J. FREDERICK C. TALBOTT, Insurance Commissioner of the STATE OF MARYLAND *vs.* THE FIDELITY AND CASUALTY COMPANY OF NEW YORK.

*Foreign Insurance Companies—Retaliatory legislation—Construction of sec. 2, of ch. 593 of the New York statutes of 1873, and sec. 138 of Art. 23 of the Code of Public General Laws of Maryland—Construction of Statutes.*

The F. and C. Co., of New York, incorporated under the laws of the State of New York, transacted business in the State of Maryland for several years prior to the year 1891. The A. C. I. and

S. Co., of Baltimore City, was organized and incorporated in 1890. Its line of business was similar to that of the F. and C. Co., of New York, and it became the rival of the latter company, in insurance business. Having applied for license to transact the business of insuring steam-boilers in New York City, the Insurance Superintendent of the State of New York, in the exercise of the discretion which the statute of that State in express terms confided to him, refused to grant such license, notwithstanding said company was ready and willing to comply with all the requirements of the State of New York preliminary to the issuance of license. In December, 1890, the F. and C. Co., of New York, tendering the usually demanded license moneys, asked for its annual license to transact business in Maryland; but was informed that in consequence of a protest from the A. C. I. and S. Co., of Baltimore City, license to transact business in Maryland would not be granted. The second section of chapter 593, of the New York statutes of 1873, provides as follows: "The said Superintendent shall have power to refuse admission to any company, corporation, or association applying to be permitted to transact the business of insurance in this State from any other State or country wherever the capital stock shall be impaired, and also whenever in his judgment such refusal to admit shall best promote the interests of the people of this State." And section 138, of Article 23, of the Code of Public General Laws of Maryland, contains the following proviso: "Provided, that when, by the laws of any other State, any deposit of money or securities is required, or taxes, fines, or penalties, or other obligations or prohibitions are imposed upon insurance companies incorporated or organized under the laws of this State, and transacting business in such other State, or upon the agents of such insurance companies, greater then those required or imposed by the laws of this State, so long as such laws continue in force, the same taxes, fines, penalties, and deposits, obligations, and prohibitions shall be imposed upon all agents or insurance companies of such State doing business in this State, instead of those prescribed by the laws of this State." Upon application by the F. and C. Co., of New York, for a writ of *mandamus* to compel the issuance of a license to it by the State Insurance Commissioner, it was HELD:

1st. That when the New York statute imposes an "obligation or a prohibition" not found in the Maryland statute, that obligation and prohibition must be treated as if found in so many words in the Maryland statute, and is to be enforced accordingly.

Talbott *vs.* Fidelity and Casualty Co.

2nd. That in such case, and for such emergency the Maryland statute makes the New York law Maryland law to control the action of the Maryland Commissioner of Insurance, and the latter was justified in refusing license to the petitioner.

3rd. That the exclusion of the Maryland company from New York State by the refusal on the part of the New York Superintendent to allow it a license, was a "prohibition" within the meaning of the Maryland statute, which justified the Commissioner in this State in putting in force the retaliatory feature of the Maryland law.

4th. That the Maryland statute was intended to be one of strict reciprocity.

5th. That such legislation is legitimate and constitutional, and its enforcement in a fair and just way, cannot operate prejudicially to the people by preventing competition.

Statutes are to be read according to the natural and obvious import of their language; and no construction ought to be made against the express letter of the statute, for nothing can so express the meaning of the makers as their own direct words.

APPEAL from the Baltimore City Court.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., IRVING, FOWLER, McSHERRY, and BRYAN, J.

*John Prentiss Poe,* and *William A. Fisher,* for the appellant.

*Bernard Carter,* for the appellee.

IRVING, J., delivered the opinion of the Court.

The question to be decided in this case arises upon an appeal from a *pro forma order* of the Baltimore City Court, directing a *mandamus to issue* against the Insurance Commissioner of the State commanding him to issue a license to The Fidelity and Casualty Company, of New York,

to do business in this State.   It is especially interesting
and important, as it involves a question of comity
between the States, and a construction of the statutes of
this State and of New York State, in relation to each
other.   The case has been argued with very great ability
by the counsel on both sides, and by the aid of that
skillful and learned debate we have been able to reach a
unanimous conclusion.

The record discloses the following state of facts:   The
appellee, for several years, as a New York corporation,
upon paying the requisite license fees, has been trans-
acting business in the State of Maryland, and has out-
standing risks in the State of over three and a half mil-
lion of dollars.   It is a corporation with two hundred
and fifty thousand dollars paid up capital.   In December,
1890, this company, tendering the usually demanded
license moneys, asked for its annual license to transact
business in Maryland.   It was informed that, in conse-
quence of a protest from The American Casualty Insur-
ance and Security Company, of Baltimore City, license to
transact business in Maryland would not be granted.

Thereupon the appellee filed its petition in the Balti-
more City Court, alleging compliance or tender of com-
pliance with all the prerequisites to the granting of a
license, and that the same had been refused.   It then
asked for a *mandamus* to compel its issuance.   Rule was
laid on the Insurance Commissioner, to show cause why
the *mandamus* should not issue.   By his answer, the
following admitted facts were disclosed:   The American
Casualty Insurance and Security Company, of Baltimore
City, was organized and incorporated in 1890, with a
paid up capital of one million of dollars, and a half
million of surplus.   Its line of business was manifold;
and similar to that of the appellee, and it became the
rival of the appellee in insurance business.   This com-
pany, having started business here, desired to open an

office and transact business in the City of New York. It applied for license to transact business in New York City. The Insurance Superintendent, of New York State replied, that under the laws of New York, he could not grant license to do more than one kind of business in that State. The application was modified, so as to ask license for only one kind of insurance, viz., that of steam boilers. Notwithstanding the company was ready and willing to comply with all the requirements of the State of New York, preliminary to the issuance of license, the Superintendent refused to grant license, in the exercise of the discretion which the statute of that State in express terms confided to him. The language of the statute of New York, to wit, of the *2nd section of chapter* 593, *of the Acts of* 1873, is as follows: "The said Superintendent, shall have power to refuse admission to any company, corporation, or association, applying to be permitted to transact the business of insurance in this State, from any other State or country, wherever the capital stock shall be impaired, and *also, whenever in his judgment,* such refusal to admit shall best promote the interests of the people of this State."

In the 138th section of Article 23, of our Code of Public General Laws, the following proviso is put: "Provided, that when by the laws of any other State, any deposit of money or securities is required, or taxes, fines or penalties, or other obligations or prohibitions are imposed upon insurance companies incorporated or organized under the laws of this State, and transacting business in such other State, or upon the agents of such insurance companies, greater than those required or imposed by the laws of this State, so long as such laws continue in force, the same taxes, fines, penalties and deposits, obligations and prohibitions shall be imposed upon all agents or insurance companies of such State, doing business in this State, instead of those prescribed by the

Talbott *vs.* Fidelity and Casualty Co.

laws of this State." The Insurance Commissioner of this State, regarding this provision of our statute as substituting the New York statute for our statute whenever the New York law differed from ours, and introduced other and greater "obligations and prohibitions," as affecting Maryland companies desiring to prosecute business in New York State, and being informed that a Maryland company, of like character with the appellee, had been excluded from New York, and refused license to do business in that State, deemed it his duty to refuse license to the appellee, to do business in this State. To test the correctness of his view of the law and conduct in the premises, this proceeding was instituted, and a *pro forma* order for *mandamus* was granted, from which this appeal was taken.

The appellee contends that the statute of Maryland does not give our Insurance Commissioner any discretion whatever, as the New York law does, in express terms, give to its Commissioner or Superintendent of Insurance; and that, therefore, when the appellee had tendered full compliance with all the provisions of our statute, which section 124, of Art. 23, of the Code enunciates, it was the imperative duty of the Insurance Commissioner to grant a license; and that his refusal was without warrant of law. The argument is that, as the statute says, that license shall not be granted *"unless* it be fully organized and possessed of the amount of capital required of similar companies formed under the laws of this State, or *until* the following conditions have been complied with," then, when it is properly organized and has the proper amount of capital, and has complied with the conditions mentioned in the statute—as was admitted was the case, as respects the appellee—there was no alternative to the Commissioner, and he must issue the license.

The appellant controverts this position, and insists that, whilst a discretion in the matter is not conferred

on the Commissioner in *express language,* as is done by the New York statute to its Superintendent of Insurance; yet, that our statute is a strictly retaliatory one, and when the New York statute imposes an "obligation or a prohibition" not found in ours, that obligation and prohibition must be treated as if found in so many words in our statute, and it is to be enforced accordingly. In other words, the contention of the appellant is that, in such case, and for such emergency, our statute makes the New York law our law to control the action of our Commissioner of Insurance. This, we think, is the correct view, and justifies the Commissioner in refusing license the appellee. We can not agree to the view, pressed with so much earnestness and ability by appellee's counsel, that the exclusion of the Maryland company from New York State by the refusal on the part of the New York Superintendent, to allow it license, was not a "prohibition" by the law of New York, within the meaning of our statute. The law of New York vests such absolute discretion in its Superintendent of Insurance, that it is within his power to exclude every Maryland company from working in New York State, if in his judgment, it was not to the interest of the New York people to have companies of other States to compete with insurance companies of that State. Now, it is perfectly clear, that our law-makers never designed that our statute should be so interpreted as to allow New York companies to have access to our State on the same terms as our own, whilst ours can not be allowed in New York State. According to the views of the appellee, that very condition of things might have existed by the action of the New York Superintendent, and yet it would not have existed *by the law* of New York. Clearly, that can not be a sound view, which might lead to such a result. The Maryland company has been shut out of New York. How has that been 'effected? By the unappealable

determination of the New York officer not to grant it a
license.  By what authority has that officer so conclu-
sively shut the door upon a Maryland company?  *By the
law* of New York, giving him the discretion and power
of prohibiting that company from entering the State of
New York to do insurance business there.  It is the *law*
that enabled the Superintendent to *prohibit*, and that is
responsible for the prohibition; and the prohibition must
be referred to and charged to the superior authority—the
*law* of New York.  It will not do to say, therefore, that
the *law* of New York, does not *prohibit*.  By its express
provisions, in certain contingencies, *exclusion*, (which is
*prohibition* most effectual,) is allowed; and supposing
that contingency as arising, the Superintendent has
excluded the Maryland company from New York; so that
it is *prohibited* now, under penalties, from attempting to
work there.  The facts show it to have been a wilful
exclusion of the Maryland company from New York.
Only two considerations are mentioned in the law, giving
the Superintendent his power to refuse license; one is
where there is an impairment of the value of the stock
of the company seeking license, and the other, when the
Superintendent, for any reason, may think it not for the
interest of the New York people, that such company
should be permitted to do business in that State.  There
was no impairment of the stock, for the company was in
unusually safe condition.  Its capital was one million of
dollars, all paid up; and it had a half million of surplus.
So safe a company could not jeopardize the interest of
the people by offering it insurance.  It was four times as
strong as the New York company in paid up capital; and
with so large a surplus, offered an unusually safe medium
of insurance in the several directions in which it took
risks.  It is apparent, therefore, that no justifying
reason existed for prohibiting it from exercising its
functions in the State of New York, and it was well

justified in asking the Commissioner in this State, to put into force the retaliatory feature of our law; and there would seem to be especial fitness in enforcing it as against the appellee, whose business is so especially along the same line and plane as the American Casualty Insurance and Security Company.

The rule for the construction of statutes is that statutes are to be "read according to the natural and obvious import of their language;" and no construction ought to be made against the express letter of the statute, "for nothing can so express the meaning of the makers as their own direct words." *Sedgwick on Statutory and Constitutional Laws*, 260. The same author, in the same connection, says that words are to be taken in their *ordinary sense*, unless such a construction would be obviously repugnant to the intention of its framers. The object and intent of a statute is always to be regarded; and of course, its language is to be understood and construed as furthering the object contemplated by the makers. A forced construction "for the purpose of extending or limiting their operation," must not be resorted to. The object of our statute is palpable. The design was to put insurance companies, coming from other States, into the same position as ours would be in the State whence they came. They were to be admitted on the same terms, and none other, than ours would be there. Companies coming from other States were intended to fare *no better* than ours would on going to their State. Any "object or prohibition" affecting Maryland companies in other States, was to operate here on companies coming here from thence. With such an objection in view, as very manifestly existed, the word "prohibition" can have but one reference and meaning, and it would be forcing it from its natural and obvious meaning in the statute to suppose, because it is used together with the language

Talbott *vs.* Fidelity and Casualty Co.

"deposit of money or securities," "taxes, fines, or penalties, or other obligations," that "or prohibitions" must have some reference to the subject of money deposits or taxes. After enumerating all the other things that might be demanded to be done, it winds up with "prohibitions," meaning thereby plainly what the word means in its most natural and usual signification. It clearly meant that if our companies were prohibited from a State, theirs were to be prohibited here. The law was intended to be one of strict reciprocity. Prohibition means, according to lexicographers, "a forbidding to do," "an inhibition," "an interdiction." When, therefore, the Superintendent refused license to the Maryland company, it was instantly forbidden to attempt to transact business in the State of New York.

That such legislation, as that of this State, which we have been called on to construe, is legitimate and constitutional is fully established by authority; but, as that has not been questioned, and the whole argument has rested on the construction of the language of the statutes of the two States, we need not cite authority in support of the law. The enforcement of the law in a fair and just way, as we have construed it, and its authority to the Commissioner, can not operate prejudicially to the people, by preventing competition. Competition is always in the interest of the masses; and a judicious officer will never unnecessarily do what will prevent it; but action, such as he has taken in this case, will tend to secure just treatment from other States. If this Maryland company was impaired in credit, and had for that reason been refused license in New York State, its prohibition from doing business there would not have given rise to the exercise of the retaliatory feature of our law, unless it was against some company from that State in like unsound condition.

Being of opinion that the *mandamus* against the appellant should not have been ordered, the order granting it must be reversed, and the petition therefor must be dismissed.

*Order reversed, and*
*petition dismissed.*

(Decided 18th June, 1891.)